# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| Southeast Ready Mix, LLC and Mayson Concrete, Inc., <br><br> *Plaintiffs,* <br><br> Argos North America Corp. f/k/a Argos USA Corp., Argos Ready Mix, LLC, Elite Concrete LLC, Elite Concrete Holdings, LLC, Elite Concrete of SC, LLC, Coastal Concrete Southeast II LLC, Evans Concrete Holdings Inc., Evans Concrete, LLC, Thomas Concrete, Inc., Thomas Concrete of Georgia, Inc., Thomas Concrete of South Carolina, Inc., Holcim (US) Inc., Cemex, Inc., Cemex Materials, LLC, and Cemex Southeast, LLC, <br><br> *Defendants.* | Civil Action No.: <br><br> **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

Plaintiffs Southeast Ready Mix, LLC and Mayson Concrete, Inc. allege as follows upon actual knowledge with respect to themselves and their own acts, and upon information and belief as to all other matters.

## NATURE OF THE ACTION

This antitrust lawsuit is brought against the participants of two separate but related cartels in the markets for portland cement and ready mix concrete in coastal Georgia and South Carolina. The cement cartel, comprising Argos, Holcim, Giant, and Cemex—all horizontal competitors—agreed to fix cement prices, while conspiring to monopolize the market. The ready mix cartel, comprising Argos, Evans, Thomas, and Elite—all horizontal competitors— allocated customers, rigged bids, and engaged in group boycotts of nonparticipating competitors, all in a quest to fix, raise, and stabilize the price of ready mix. Common to both cartels is Argos, a vertically integrated international supplier of both products, which leverages its dominant position in the upstream cement market to benefit the cartel in the ready mix concrete market.

The participants in the cement cartel have, since at least 2012, conspired to fix prices by agreeing to periodic coordinated price increases, which they typically explain in price increase letters to customers as arising from increased material and distribution costs. The ready mix cartel has, since at least 2009, sought to corner the market for ready mix used in residential, commercial, and infrastructure projects. Each time a new rival enters the market, the existing suppliers either convince them to join the ready mix cartel

2

or run them out of business through predatory collusion and other exclusionary acts.

Cement is an essential ingredient of ready mix concrete and is key to the ready mix cartel's scheme: Argos abuses its dominant and cartel position in the cement market to assist the ready mix cartel by providing intelligence and offering rebates to certain firms that are part of the ready mix cartel in its coordinated effort to predatorily price the nonparticipating firms out of the market. Argos assures through its actions in the ready mix cartel downstream that its members become loyal cement customers upstream, where it can maximize its profits. In turn, the ready mix cartel is able to raise and fix prices above competitive levels when it is able to vanquish competition through predatory conduct.

Ready mix cartel members are rewarded by their complex scheme of price-fixing, bid rigging, customer allocation, group boycotting, and predatory pricing, among other anticompetitive conduct. And because the ready mix business requires substantial capital and cash flow, new entrants already face a steep uphill battle in dealing with the entrenched cartel. These new entrants almost invariably go out of business because of the cartel's anticompetitive conduct, and the cartel resumes its supracompetitive price-fixing scheme. Ultimately customers of both cement and ready mix suffer damages through

overcharges and competitors of ready mix cartel members suffer damages from their exclusion. Plaintiffs Southeast Ready Mix (and its predecessor entities) and Mayson are such competitors, and they have collectively suffered at least $50 million in lost profits and other damages resulting from the cartels' conduct. Mayson and Southeast Ready Mix are also injured customers of the cement cartel.

This is an action for conspiracy to restrain trade by group boycott under Sherman Act Section 1 in the ready mix concrete market, conspiracy to fix prices in the cement market under Sherman Act Section 1, and monopolization, joint monopolization, and conspiracy to monopolize both markets under Sherman Act Section 2, and state law claims for restraint of trade and tortious interference with business relationships.

## JURISDICTION AND VENUE

1.     This Court has primary subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337(a), and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 because this action arises under the antitrust laws of the United States.

2.     This Court has supplemental jurisdiction over the state law claims of the complaint under 28 U.S.C. § 1367 because they arise from the same

nucleus of operative facts as the federal claims such that they form part of the same case or controversy.

3.     Argos North America Corp. is registered to do business in Georgia and may be served via its registered agent, Corporation Service Company in Norcross, Georgia. Argos North America is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Argos North America has minimum contacts with this district in that it monopolized a market in this state and conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

4.     Argos Ready Mix LLC is organized in Georgia and may be served via its registered agent, Corporation Service Company in Norcross, Georgia. Argos Ready Mix is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

5.     Elite Concrete LLC is organized in Georgia and may be served via its registered agent, Troy Baird, in Savannah, Georgia. Elite Concrete is subject to personal jurisdiction because it resides in Georgia.

6.     Elite Concrete Holdings LLC is organized in Georgia and may be served via its registered agent, Troy Baird, in Savannah, Georgia. Elite

Concrete Holdings is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

7.     Elite Concrete of SC, LLC is registered to do business in Georgia and may be served via its registered agent, Troy Baird, in Savannah, Georgia. Elite Concrete of SC is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Moreover, Elite Concrete of SC has minimum contacts with this state in that it conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

8.     Coastal Concrete Southeast II LLC is organized in Georgia and may be served via its registered agent, Thomas Cullen, in Savannah, Georgia. Coastal Concrete Southeast II is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

9.     Evans Concrete Holdings, Inc. is incorporated in Georgia and may be served via its registered agent, Timothy Strickland, in Claxton, Georgia. Evans Concrete Holdings is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

10.     Evans Concrete LLC is organized in Georgia and may be served via its registered agent, Timothy Strickland, in Claxton, Georgia. Evans

Concrete is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

11.     Thomas Concrete, Inc. is registered to do business in Georgia and may be served via its registered agent, Alan Wessel, in Atlanta, Georgia. Thomas Concrete is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Thomas Concrete has minimum contacts with this state in that it conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

12.     Thomas Concrete of Georgia, Inc. is incorporated in Georgia and may be served via its registered agent, Fredrik Hoeglund, in Atlanta, Georgia. Thomas Concrete of Georgia is subject to personal jurisdiction in the State of Georgia because it resides in Georgia.

13.     Thomas Concrete of South Carolina, Inc. is registered to do business in Georgia and may be served via its registered agent, Lawson William Porter, in Atlanta, Georgia. Thomas Concrete of South Carolina is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Thomas Concrete of South Carolina

has minimum contacts with this state in that it conspired to engage in anticompetitive conduct in this state, and this lawsuit is related to those contacts.

14.    Holcim (US) Inc. is registered to do business in Georgia and may be served via its registered agent, C T Corporation System, in Lawrenceville, Georgia. Holcim (US) is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Holcim (US) has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.

15.    Cemex, Inc. is registered to do business in Georgia and may be served via its registered agent, Corporate Creations Network, Inc. in Marietta, Georgia. Cemex is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Cemex has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.

16.    Cemex Materials, LLC is registered to do business in Georgia and may be served via its registered agent, Corporate Creations Network, Inc. in Marietta, Georgia. Cemex Materials is subject to personal jurisdiction in the

State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Cemex Materials has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.

17.    Cemex Southeast, LLC is registered to do business in Georgia and may be served via its registered agent, Corporate Creations Network, Inc. in Marietta, Georgia. Cemex Southeast is subject to personal jurisdiction in the State of Georgia under O.C.G.A. § 9-10-91(1) and (2) because it transacts business in this state and because it committed tortious acts within this state. Cemex Southeast has minimum contacts with this state in that it conspired to fix prices in this state, and this lawsuit is related to those contacts.

18.    Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b) and 15 U.S.C. §§ 15, 22 because Defendant Argos Ready Mix, LLC resides in this district.

## PARTIES

19.    Plaintiff Southeast Ready Mix, LLC is a ready mix concrete supplier that provides concrete for residential and commercial projects in Savannah, Statesboro, Bluffton/Hilton Head, and surrounding areas. Southeast Ready Mix is owned by Jason Wells and Mark Turner. Southeast

Ready Mix is a successor company to Savannah Ready Mix LLC, Savannah Concrete, Inc, and Bluffton Concrete, LLC.

20.     Plaintiff Mayson Concrete, Inc.[1] was a ready mix concrete supplier that provided concrete for residential and commercial projects in Savannah, Statesboro, and Bluffton/Hilton Head, and surrounding areas. Mayson became insolvent in late 2011 due to Defendants' conduct and sold its assets to Southeast Ready Mix in April 2012. Mayson, however, remained a separate company with its own debts.

21.     Defendant Argos North America Corp. (formerly Argos USA Corporation) is a Houston-based wholly owned subsidiary of Cementos Argos, S.A. with offices in Atlanta, that supplies cement in the United States, and particularly in the southeast United States.

22.     Defendant Argos Ready Mix, LLC (together with Argos North America, "Argos") is an Atlanta-based wholly owned subsidiary of Cementos Argos that supplies ready mix concrete in the southeast United States, including the relevant geographic markets further described below. Argos Ready Mix is a mere alter ego of Argos North America Corp.; it is not an independent center of decisionmaking. In 2011, Argos bought its largest ready

---

1.     Southeast Ready Mix and Mayson are collectively referred to as Southeast Ready Mix except where context dictates otherwise.

mix competitor, Lafarge Concrete. Even before that acquisition, Argos was the fifth largest ready mix producer in the United States.

23. Defendants Elite Concrete LLC, Elite Concrete Holdings, LLC, and Elite Concrete of SC LLC (together, "Elite") are a ready mix concrete supplier in Walthourville, Georgia doing business as Elite Concrete that provides concrete for residential and commercial projects in coastal Georgia and southeastern coastal South Carolina. The Elite companies work together and participate in the market as a single independent center of decisionmaking.

24. Defendants Thomas Concrete, Inc., Thomas Concrete of Georgia, Inc., and Thomas Concrete of South Carolina, Inc. (together, "Thomas") are an Atlanta-based ready mix concrete supplier doing business as Thomas Concrete that provides concrete for residential and commercial projects in coastal Georgia and southeastern coastal South Carolina. The Thomas companies work together and participate in the market as a single independent center of decisionmaking. Thomas Concrete is the successor entity to several entities formerly doing business as Coastal Concrete in Pooler, Georgia.

25. Defendant Coastal Concrete Company, Inc. is a Pooler, Georgia-based ready mix concrete supplier doing business as Coastal Concrete that provides concrete for residential and commercial projects in coastal Georgia

and southeastern coastal South Carolina. On information and belief, Coastal Concrete was acquired by Thomas Concrete in 2015.

26.    Defendants Evans Concrete Holdings, Inc. and Evans Concrete, LLC (together, "Evans") are a Claxton, Georgia-based ready mix concrete supplier doing business as Evans Concrete in coastal Georgia and southeastern coastal South Carolina. The Evans companies work together and participate in the market as a single independent center of decisionmaking.

27.    Defendant Holcim (US), Inc. is the U.S. subsidiary of an international cement supplier. In 2015, Holcim's parent company, Holcim Ltd., and another international cement supplier, Lafarge, merged to become LafargeHolcim and now claims to be the largest manufacturer of building materials in the world.

28.    Defendants Cemex, Inc., Cemex Materials, LLC, and Cemex Southeast, LLC are U.S. subsidiaries of international cement supplier Cemex S.A.B. de C.V. doing business as Cemex and/or Cemex USA. The Cemex companies work together and participate in the market as a single independent center of decisionmaking.

29.    Defendants and their employees and agents participated personally in the unlawful conduct challenged in this complaint and, to the extent they did not personally participate, they authorized, acquiesced, set in

motion, or otherwise failed to take necessary steps to prevent the acts complained of in this complaint.

## SUBSTANTIVE ALLEGATIONS

30.     Starting in approximately 2009, Argos, Evans, Elite, and Coastal (later Thomas) combined and conspired to jointly monopolize and ultimately fix prices in the market for ready mix concrete in southeast Georgia (including Bluffton and Hilton Head, South Carolina). Together, their combined market share at all times exceeded 80%. These companies formed a cartel to dominate the market and conspired to protect that domination from competitive threats. The motivations and success of this ready mix cartel were supported by Argos' ability to price supracompetitively in the cement market.

31.     From time to time, a new ready mix competitor will enter the market. If the competitor is a threat—that is, if it is sufficiently large to handle substantial projects and compete with the ready mix cartel—the ready mix cartel will attempt to recruit the competitor to avoid price competition.

32.     If the competitor is unwilling to cooperate in the price-fixing and market-allocation scheme, however, the ready mix cartel has an effective punishment regime designed to assure compliance or to drive the new entrant out of the market:

a.   Trusted employees of the conspiring firms take turns following the competitor's trucks to job sites and report intel on customers and locations to the cartel and then communicate that information among the cartel members;

b.   Argos taps into a trusted manager, Jim Pedrick, to determine the amount of cement that the rogue ready mix price competitor is purchasing. If the competitor is purchasing from Argos' cement competitors, Pedrick is also able to obtain intel on purchase volume (because Argos and its cement competitors separately agreed to an anticompetitive course of conduct in the cement market and to trade competitively sensitive information). The cartel determines how much concrete the competitor is selling based on its cement purchases and simple math, which allows the cartel to assess the degree of competitive threat and the competitor's wherewithal to withstand the cartel's collusive efforts (such as predatory price cutting);

c.   Armed with this information, cartel members then develop a turn-based approach to price-cutting the hard-earned customers of the "rogue" price competitor; by engaging in this

type of bid rigging, the cartel members are collectively able to withstand significantly more losses in order to take the price competitor's customers; moreover, cartel members, individually and collectively, recoup any losses from the price cuts when the price competitors inevitably leave the market and the cartel members again raise prices to supracompetitive levels;

d.   Additionally, Argos provides rebates of up to 50% on cement purchases when certain cartel members are pricing predatorily, which significantly (and artificially) decreases the costs of materials to allow them even more room to engage in predatory pricing, and more quickly put the target competitor out of business. Argos can afford such steep rebates because it is already pricing supracompetitively as a monopolist and/or by agreeing to fix prices and allocate customers and markets with its cement competitors. And Argos also maintains its monopoly power in the cement market by ensuring its concrete customers—cartel members—become loyal cement customers in return for

sharing its monopoly rents when engaging in predatory conduct;

e. Argos works with its conspirators in both markets to make it more difficult or impossible for low-price competitors to obtain essential materials for concrete, such as rock and cement. For example, Argos sought and obtained an agreement from Holcim that neither company would supply cement to Baca Concrete or Bulloch Concrete because they competed on price with the concrete cartel;

f. Argos supplies the cartel with information derived from its illegal price-fixing conspiracy with Holcim, Giant, and Cemex to set cement prices by disclosing the future price of cement before it becomes public, in order to give cartel members an advantage in outbidding or otherwise weakening a competitor in the market; and

g. In some cases, Argos or other members of the cartel will buy out the competitor (after the competitor is sufficiently weakened and has little choice but to sell).

33. Once a competitor is no longer a competitive threat, the ready mix cartel reengages in its ready mix price-fixing scheme through which its

members overcharge their customers as much as $15 per yard (more than 20% overcharge). In certain market areas, a "scorecard" is kept between the members, each taking turns winning or sharing jobs to ensure that premium prices are charged to customers, thereby avoiding competition with each other. Southeast Ready Mix and its predecessor Mayson have both been targets of the ready mix cartel.

### The Cartel Targets Mayson and Later Southeast Ready Mix

34.    Beginning in 2007, Jason Wells opened a ready mix plant and began operating as Mayson Concrete in the Savannah and Statesboro markets. Mayson immediately gained market share by pricing competitively.

35.    In 2010 Argos, which had a close relationship with Elite Concrete due to two brothers (Greg Melton, of Argos, and David Melton, who went directly from managing Lafarge Concrete ready mix operations to managing Elite) working for each of the respective companies, began meeting with Evans and Coastal to discuss strategies to cut out Mayson as the low-price leader. Mayson was a small, relatively new company still developing its footing in the market. Its competitors knew that Mayson was vulnerable in a business that depends heavily upon capital and cash flow.

36.    The ready mix cartel pulled out all the stops to put Mayson out of business. They followed Mayson's trucks around to job sites and took turns

predatorily undercutting it on price to those same customers, gradually eroding a customer base that Mayson fought hard to earn. They also agreed amongst themselves not to do business with Mayson (such as the standard practice of renting and/or loading each others' mixer trucks) and attempted to raise Mayson's cement prices higher than for members of the cartel. For example:

a.   **February 28, 2012**. Jim Pedrick, a cement salesman for Argos, serves as the middle-man between Tim Coughlin, president of Coastal, and Argos concrete managers including Greg Melton, and Troy Baird, co-owner of Elite. The competitors exchange price-increase letters through Pedrick to confirm their compliance with the agreement to increase prices.

b.   **March 12, 2012**. Greg Melton of Argos tells sales employees they are allowed to match any prices of Elite and Coastal, but undercutting them is a fireable offense. Melton explains that sales representatives should aggressively target Premier Concrete and Mayson Concrete, who were not participating in the conspiracy.

c.   **March 23, 2016**. Mike Taylor (Argos) tells salesmen not to compete with Evans or Thomas for jobs, stating that quotes near Evans' or Thomas' plants should be sky high. In contrast, he encourages salesmen to undercut Southeast Ready Mix. Taylor explains that control of the Savannah market by the cartel is important because Argos sells cement to itself and cartel members from the Savannah port.

d.   **April 27, 2016**. Mike Taylor tells his sales team to "go heavy" after Elite and Southeast Ready Mix but are not to compete with Thomas because they would continue with the agreement. Elite was to be punished because it was no longer participating in the cartel due to the departure of David Melton (Greg Melton's brother).

e.   **June 2, 2016**. Greg Melton (for Argos) drops price on a job for Joe n' Guy next to the Southeast Ready Mix plant that both companies were bidding on, expressly noting that it was below cost and stating that, even if not successful, it would cause Southeast Ready Mix to "nut up" its price and take a loss for the job.

37.    By 2012, Mayson was going out of business because of the cartel's anticompetitive conduct. Argos regional manager Andy Stankwych told his team March 6, 2012 that "a change in attitude" was in order due to the less competitive environment, and instructed his staff to coordinate with competitors to come up with a plan for a price increase.

38.    Meanwhile, Jason Wells partnered with Mark Turner in a new firm, which purchased Mayson's plants and other assets. The cartel took note, with an Argos employee complaining "there goes the price increase." This development threw a wrench in the gears after the cartel's opportunity had materialized.

39.    The cartel first attempted to "reason" with Mark Turner around mid-April, 2012 by trying to convince him to put out a price increase letter as the members of the cartel had planned. Trey Cook of Elite asked Turner to meet him at Savannah Bank, where he hopped into Turner's truck and told him that Coastal, Argos, and Elite had all agreed on new environmental fees and surcharges and that Southeast Ready Mix should too. Turner refused and told Cook that he would not make illegal agreements and that he would not meet privately with a competitor again.

40.    The cartel thereafter took the same approach as it did with Mayson: its members followed Southeast Ready Mix trucks to job sites,

obtained its pricing and cement order information from Argos and Holcim, allocated customers and markets, and used cement rebates and credits to predatorily undercut Southeast Ready Mix on price by pricing below cost:

a.  **March 30, 2012**. Greg Melton of Argos discusses Troy Baird of Elite threatening Mark Turner of Mayson Concrete to play along with price increases initiated by Argos, because if he took any customers from Elite, he would suffer.

b.  **April 3, 2012**. Greg Melton (Argos) and David Melton (Elite) discuss details of price stabilization efforts by phone at around 5 p.m. The two decide that the cartel participants will add a fuel surcharge to all ready mix concrete deliveries.

c.  **May 15, 2012**. Pedrick relays to Argos concrete management that cartel members have agreed to stop buying sand from Clark Block due to his business and familial relationships with Mark Turner and Jason Wells at Southeast Ready Mix.

d.  **May 23, 2012**. An Argos employee follows Southeast Ready Mix truck to gain intelligence on its customers and pricing to share with cartel members.

e.  **May 30, 2012**. Cartel members, including at least Greg Melton (Argos), Andy Stankwych (Argos), and Trey Cook

(Elite) meet for breakfast at Cracker Barrel to discuss market prices. Melton relays that Elite had to drop its price below $86 per yard for specific jobs due to competition from Southeast Ready Mix.

f.   **June 19, 2012**. Greg Melton informs Argos management team that it is allocating certain customers to Evans, sharing Southeast Ready Mix and Premier Concrete customer lists obtained both through Pedrick and by following around their mixers, and discusses undercutting them on price with their largest customers.

g.   **October 16, 2012**. Jim Pedrick communicates between Argos and Coastal about strategies for taking back market share from Southeast Ready Mix.

h.   **October 25, 2012**. Argos and Coastal discuss coordinated price increase of $7 per yard to occur January 1.

i.   **October 31, 2012**. Greg Melton (Argos) and Bo Strickland (Evans) coordinate bids for certain jobs using the "Statesboro scorecard." The scorecard permitted members of the cartel to alternate turns winning or sharing jobs in the Statesboro area to ensure that premium prices are charged to customers,

or that losses are shared in undercutting low-price leaders such as Southeast Ready Mix. Melton thereafter discusses the "Statesboro scorecard" with his boss, Andy Stankwych.

j.  **May 14, 2013**. Argos internally discusses pricing intelligence gathered on Southeast Ready Mix to determine how to undercut it in the market in a way that allows them to price below cost and later recoup their losses.

k.  **October 9, 2013**. Jim Pedrick acts as conduit to coordinate a price increase between Argos and Elite (via David Melton).

l.  **October 11, 2013**. Pedrick tells Argos' ready mix leadership that he has lunch set with Coastal for the following Thursday, that he already coordinated with Elite, and that Evans will also agree to the price increase.

m.  **October 17, 2013**. Pedrick confirms that Bo Strickland (Evans) agrees to an $8 per yard ready mix price increase.

n.  **October 18, 2013**. Pedrick confirms that Argos and Coastal price increase letters for $8 per yard have gone out.

o.  **Generally**. From the beginning of the cartel's formation until David Melton's departure from Elite in late 2015, Greg Melton (Argos) and David Melton (Elite) regularly met at

23

Sunshine Restaurant to discuss cartel strategy and make sensitive price, output, and competitor information exchanges, implementing the plan with other cartel members through Jim Pedrick to cloak their activities with an aura of legitimacy, as Pedrick supplied them with cement.

### The Green Zone/Get Busy Policy

41.   In 2016, a combination of continued competition by non-cartel ready mix competitors and a sales downturn warranted another point of attack for the cartel: cartel members would carve out geographic areas of the market in which all jobs were to be allocated to a particular cartel member.

42.   In tandem with this strategy, Argos cement established "green zones," the area around its ready mix plants and those of each cartel member, with a radius of about five miles or 15 minutes' drive from the plant (these were rough approximations, because some cartel members' plants were close to one another). At least for Argos and Evans, any concrete job within a "green zone" would be subject to an automatic cement credit/rebate, typically of $15 dollars. On information and belief, Argos may have also extended the rebates to other cartel members. The receipt and use of these rebates and credits ensured Argos (or another cartel member) bidding in its zone would be successful against non-cartel members such as Southeast Ready Mix.

24

43.     In any case, any ready mix cartel member that did not respect a green zone by bidding jobs within it would be subjected to numerous consequences to ensure compliance. Jim Pedrick of Argos assisted with enforcing this scheme by intimidating any ready mix company to not build a concrete plant within a green zone and reiterating that such conduct would result in a loss of all its cement advantages or price cutting near the cheating cartel member's plants. And Argos' sales teams were often instructed to bid high on jobs near ready mix cartel members' plants to avoid competition in green zones.

44.     The cartel regularly discussed the green zone policy as part of its strategy to exclude Southeast Ready Mix and other nonparticipating competitors:

   a.    **March 3, 2016**. Greg Melton tells Argos sales team that Argos USA will provide cement credits on certain jobs in order for Argos to win bids by undercutting Southeast Ready Mix and Premier.

   b.    **March 7, 2016**. Cartel members discuss green zone policy and selective predatory price-cutting strategy to eliminate nonparticipating competitors.

    c.    **April 1, 2016**. Jim Pedrick gives Greg Melton a $15 per ton break on cement so that Argos can undercut Southeast Ready Mix in an attempt to take one of its loyal customers, Jett Concrete (a concrete finisher out of Jacksonville, Florida).

    d.    **April 8, 2016**. Greg Melton and Jim Pedrick discuss cement credits/rebates for a Circle K job next to Southeast Ready Mix's plant. Although Argos then attempted to undercut Southeast Ready Mix on price for the job, it was ultimately unsuccessful.

    e.    **May 12, 2016**. Greg Melton discusses success of green zone strategy with cartel members, bragging about jobs that were won as a result of cement credits received from Argos USA, and further discusses additional areas in which the selective rebate/predatory price-cutting strategy can provide competitive advantages.

### Anticompetitive Conduct in the Cement Market

45.    Argos' dominant position in the cement market for coastal Georgia and southeastern coastal South Carolina Georgia plays a significant role in the ready mix cartel's ability to punish and exclude rogue competitors as a corporate relative of Argos Ready Mix. Argos participates in the ready mix

cartel downstream, which is structured to cause its members to become loyal cement customers upstream, where it has monopoly power and maximizes its profits. It shares some of its monopoly rents with the downstream cartel to engage in predatory conduct. In turn, the ready mix cartel is able to raise and fix prices above competitive levels when competitors are not challenging it, and Argos maintains its dominant position in the cement market.

46.    In Savannah, Argos has more than 70% market share among cement suppliers, with Holcim holding 10% and Giant holding 20%. In Statesboro, Argos has held 100% market share since purchasing Lafarge in 2011. Cemex has negligible market share in the relevant markets, but significant market share in Atlanta, which means successful price-fixing among cement suppliers is more effective with its participation.

47.    Therefore, with this strategy, Argos uses its monopoly power in the upstream cement market in at least two ways: First, Argos participates in the ready mix concrete cartel downstream, which ensures its members become loyal cement customers upstream. This allows Argos to maintain and reinforce its existing dominant position in the cement market. Second, by leveraging its monopoly power in the cement market, Argos—together with its co-conspirators Evans, Elite, and Thomas—imposes anticompetitive conditions in the downstream market for ready mix concrete in support of its conspiracy to

jointly monopolize and ultimately fix prices in the coastal Georgia and southeastern coastal South Carolina market. Through this arrangement, Argos can still keep tabs on concrete suppliers such as Southeast Ready Mix to further the downstream concrete cartel's goals. Southeast Ready Mix is harmed both as an end-purchaser of cement and as a disfavored and targeted competitor in the downstream ready mix concrete market.

48.   Additionally, competitors in this highly concentrated cement market collude. Since at least 2012, Argos, Cemex, Giant and Holcim have conspired to fix prices in the cement market and to exchange competitively sensitive information about pricing and customers. For example:

a.   On or around approximately October 25, 2012, Jim Pedrick of Argos discussed a coordinated price increase to occur in the Savannah market as of January 1, 2013 with Dan Cleary, a representative from Giant Cement.

b.   On or around August 27, 2013, Jim Pedrick and representatives from Holcim, Giant, and Cemex agree to a January 1 price increase of $8 per ton. Pedrick states August 30, 2013 that Argos' attorneys instructed him to make his price increase for January 15 to reduce the chance of detection.

c.  In 2016, Bill Wagner, president of Argos North America, personally negotiated with Cemex and Holcim to implement a cement price increase of $14 per ton.

d.  On March 26, 2016, Argos North America's accountant confirmed with Argos' ready mix management team and Mike Taylor that the cement suppliers agreed to increase prices as of April 1.

e.  Holcim and Argos (and earlier, Lafarge) would consistently exchange "market reports" with sensitive pricing and output information.

## THE RELEVANT MARKETS

49.  The relevant product markets are the markets for portland cement and ready mix concrete:

a.  **Portland cement** is a binding agent essential to any ready mix concrete mixture—it is the glue that binds the components of concrete together. Portland cement is subject to established industry and governmental standards that ensure its consistency and uniformity. As a result, portland cement is a commodity that is interchangeable and homogeneous across manufacturers. There are only six major

suppliers of portland cement who control substantially all of the supply of portland cement in the Western Hemisphere. There are no real substitutes for portland cement because industry standards require its use. The primary purchasers of portland cement are ready mix concrete suppliers, who typically pick up portland cement from a cement company's plant or terminal in trucks. Few customers are likely to switch to other products in response to a small but significant price increase because portland cement has no close substitute and its price represents a relatively small percentage of a project's overall construction costs. Barriers to entry are high in the cement market. Constructing a new portland cement plant of sufficient size to be competitive would likely cost over $300 million and take more than five years to permit, design, and build. Even the expansion of an existing facility would likely cost hundreds of millions of dollars and take four or more years to complete. Building competitive cement distribution terminals is also difficult and time consuming. It can take more than two years to acquire a suitable location, obtain the necessary permits, and

complete construction of a competitive terminal in the relevant markets

b. **Ready mix concrete** is concrete manufactured in a batching plant according to a set mix design (i.e., recipe) that is then delivered to a work site by a mixer truck in a freshly mixed, unhardened state. The mixture contains portland cement, water, aggregates such as sand, gravel, and crushed stone, and sometimes additives such as fibers, mesh, and chemical admixtures. The purpose of ready mix concrete is to provide a precise, quality controlled mixture that is ready to be placed, molded, and formed when it arrives on site. The production, delivery, use, and characteristics of ready mix are subject to well-established industry and governmental standards, including those published by ASTM International, American Concrete Institute, and myriad state and federal transportation agencies that ensure the consistency and uniformity of ready mix. As a result, ready mix is a commodity that is interchangeable and homogeneous across manufacturers. Due to its exceptional characteristics as a building material, ready mix concrete customers would not

switch to other materials in the event of a small but significant increase in price.

c.   Portland cement and ready mix concrete are separate product markets in the same way that eggs and cake are separate product markets.

50.   Because portland cement and ready mix concrete are both commodities that are viewed as interchangeable by the consumer, their markets are more conducive to cartel activity. The FTC has analyzed the cartelized nature of both markets in two recent merger decisions. Regarding the cement market, the FTC stated that: "The relevant markets are vulnerable because they are highly concentrated; cement is a homogenous product; and sales are small, frequent, and usually not made pursuant to long-term contracts. The markets also exhibit a high degree of transparency: competitors are commonly aware of each other's production capacities, costs, sales volumes, prices, and customers. The evidence indicates that the merging firms already closely monitor competitors' cement pricing and sales, which facilitates coordination".[2] Similarly, for the ready mix concrete market the FTC concluded

---

2.       *See In the Matter of Holcim Ltd. and Lafarge S.A.*, FTC File No. 141-0129.

that "[c]oordination is particularly likely where the relevant product is homogenous, as is ready-mix concrete".[3]

51.   Since both markets are highly concentrated, homogeneous and with a high degree of transparency, collusion is thus more likely in these markets because competitors are commonly aware of each other's production capacities, costs, sales volumes, prices, and customers, and it is easy to monitor and retaliate against potential deviation from a coordinated scheme.

52.   The relevant geographic market for portland cement is an area roughly comprising coastal Georgia and southeastern coastal South Carolina, with boundaries of a (roughly) 200-mile radius around Harleyville, South Carolina. Harleyville is the location of the cement mills for Argos, Holcim, and Giant. The precise scope of the area that can be served by a particular plant or terminal depends on a number of factors, including the density of the specific region and local transportation costs. Due to transportation costs, cement markets are local or regional in nature. The raw materials are mined, processed, and milled into cement at these mills. The cement suppliers are unlikely to supply customers further than 200 miles because the cost of transport rises, and customers more than 200 miles away are likely to be closer

---

3.      *See In the Matter of Cemex, S.A. de C.V.*, File No. 051 0007, Docket No. C-4131.

to other cement mills. Cemex in Macon, Georgia, for example, is less competitive in Statesboro, Savannah, and Hilton Head/Bluffton because it is, on average, twice as far from those locations as the mills in Harleyville.

53.     The relevant geographic markets for ready mix concrete are three distinct areas roughly comprising Statesboro, Georgia; Savannah, Georgia; and Hilton Head/Bluffton, South Carolina. Ready mix concrete markets are highly localized in nature. Due to high transportation costs and a limited time from batching to curing, markets for ready mix concrete are necessarily limited in geographic scope:

> a.    Logistically, the closer the distance between the site and plant, the better. For one, transportation costs comprise a significant proportion of the cost of the final delivered product. Due to a low value-to-weight ratio, transportation also effectively limits the distance that ready mix concrete can be shipped. Second, ready mix concrete is perishable— once it is blended at a plant and loaded into a truck, it will solidify if it is not poured in a timely manner (typically less than an hour). Practically speaking, accounting for time between batching and transport and pouring, as well as additional delays, setup at the job site, and the time it takes

to actually pour and place the concrete, ready mix suppliers typically limit their mixer drive time to a radius of about 20-30 minutes because conditions are typically far from ideal and require a large margin of error.

b.    As a result, the geographic markets for ready mix concrete are fairly small. Statesboro, Savannah, and Hilton Head/Bluffton are thus too far away from one another for a plant in one of these locations to profitably service another.

c.    Geographic markets for ready mix concrete also have a lower limit, because the customer base and volume of industrial, commercial, infrastructural/public works, and residential construction must be significant enough to justify one or more ready mix concrete plants.

54.    Defendants in the market for ready mix concrete have market power:

a.    **Statesboro**. Argos has approximately 49% market share and Evans has approximately 49% market share (the remaining 2% share is Southeast Ready Mix).

     b.    **Savannah**. Argos has approximately 30% market share, Coastal/Thomas: 30% market share; Elite: 15%; Premier: 12%; Southeast Ready Mix: 12%; and other: 1%.

     c.    **Hilton Head/Bluffton**. Argos has approximately 15% market share; Coastal/Thomas: 15%; Elite: 25%; Palmetto: 10%; Premier: 15%; and Southeast Ready Mix: 20%.

55.    Significant barriers to entry exist in the market for ready mix concrete, including investment into ready mix concrete manufacturing facilities, mixer trucks, material costs, and substantial cash-on-hand.

56.    The cement cartel has market power in the market for portland cement. Argos' market share in the coastal Georgia and southeastern coastal South Carolina market is approximately 70%. Combined with Holcim, Giant, and Cemex, the cement cartel has more than 90% market share and the ability to raise prices and exclude competition.

### HARM TO PLAINTIFFS AND COMPETITION

57.    Southeast Ready Mix and other consumers of cement— particularly those that did not participate in the ready mix cartel—paid supracompetitive prices for cement and were competitively disadvantaged by Argos' rebate and credit scheme and the cement cartel's supracompetitive price-fixing scheme. Southeast Ready Mix was also harmed through lost

36

business and other injury by the exclusionary conduct by defendants in the ready mix concrete market. This injury includes, among others, harm, the reduction in Southeast Ready Mix's sales volume resulting directly from defendants' anticompetitive conduct, which inhibited Southeast Ready Mix's ability to achieve necessary economies of scale and limited Southeast Ready Mix's profits and expansion opportunities in the defined relevant markets and others.

58.     Mayson, in addition to the above, was also completely pushed out of the market and became insolvent in late 2011. Because of defendants' conduct, Mayson was unable to make a profit and had to purchase cement, aggregates, and other materials on credit. By early 2012, Mayson was in debt for approximately $1.5 million in materials and equipment and lacked income sufficient to service that debt.

59.     The cement cartel's separate anticompetitive conduct in the market for portland cement, downstream caused consumers of ready mix concrete harm through reduced competition and increased prices.

60.     Through the exclusion and systematic efforts to competitively disadvantage Southeast Ready Mix and other firms not participating in the ready mix cartel, consumers of ready mix concrete products suffered

supracompetitive prices, reduced quality products, and reduced choice among suppliers in the market:

    a.    Consumers of ready mix were overcharged as much as 20% during the relevant period.

    b.    While competition was adequately suppressed, consumers of ready mix concrete in the relevant markets, including four of Southeast Ready Mix's customers—Horizon Homes, Beacon Homes, V.B. Construction, and Baca—purchased bad concrete ("868" and "G-crete") from Argos that Argos knew to be inferior and inappropriate for use in construction. Customers, including residential homeowners, suffered construction defects and other consequences as a result.

## THE STATUTE OF LIMITATIONS DOES NOT BAR THE CLAIMS

61.    Southeast Ready Mix had no knowledge of the combinations or conspiracies alleged in this complaint or of facts sufficient to place it on inquiry notice of the claims set forth in this complaint until, at the earliest, September 2016, when it learned of the conduct described in this complaint.

62.    Southeast Ready Mix had no means by which it could have discovered the combinations and conspiracies in either product market prior to

September 2016. No information, in the public domain or otherwise, was available to Southeast Ready Mix prior to September 2016.

63.    Publicly, Argos, for example, has stated repeatedly that it has an antitrust compliance policy, including as part of its "Path of Sustainability" public report available on its website. It is reasonable to believe that Argos was enforcing this antitrust compliance policy. Likewise, Holcim's "Code of Business Conduct," also publicly available, states that "Holcim believes in free markets and fair competition" and that it does not violate antitrust laws because it is "never in Holcim's interest."

64.    For these reasons, the statute of limitations for conduct occurring at least as early as 2009 did not begin to run until September 2016.

65.    Moreover, the statute of limitations is tolled by the doctrine of fraudulent concealment, as all defendants, as is common for illegal antitrust conspiracies, concealed their illegal and anticompetitive conduct from its victims and the public. Southeast Ready Mix, other ready mix suppliers, and the public had no knowledge of the combinations and conspiracy alleged in this complaint, or of facts sufficient to place them on inquiry notice of their claims because the cartel fraudulently concealed its conduct.

66.    In an effort to further conceal cartel activity, Defendants misrepresented market conditions to explain price changes and other

anticompetitive conditions. For example, Argos falsely attributed price hikes and fuel surcharges to changes in input costs in its price increase letters to its cement and ready mix concrete customers.

67.   To further cloak its illegal competitor discussions, the ready mix cartel used Argos' Jim Pedrick as a conduit to pass information back and forth amongst one another. As a cement salesman, Pedrick's discussions with Argos' ready mix competitors would not raise red flags. Pedrick even reassured others that passing information through him would protect them because it's not suspicious for a supplier to meet with its customers. For example, Pedrick and other Argos' management rebuffed concerns raised by employees Tommy Waters and Hugh Papy.

68.   By their very nature, the conspiracies were also inherently self-concealing. The antitrust laws apply in the cement and ready mix industries, and thus Southeast Ready Mix reasonably believed that these were competitive industries. It could not have discovered the conduct described herein prior to September 2016 by reasonable diligence because of the secrecy and deceptive practices employed by Argos and its co-conspirators to avoid detection and fraudulently conceal their conduct.

69.   For these reasons, the statute of limitations applicable to Southeast Ready Mix's claims was tolled until at least September 2016.

## COUNT I – READY MIX DEFENDANTS

## Joint Monopolization of the Ready Mix Concrete Market
## 15 U.S.C. § 2

70.     Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

71.     Section 2 of the Sherman Act, 15 U.S.C. § 2 provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

72.     Defendants jointly possess monopoly power in the market for ready mix concrete in coastal Georgia and southeastern coastal South Carolina. They have the power to exclude competition and raise prices, and have exercised that power to exclude Southeast Ready Mix from the market, to harm competition, and to charge supracompetitive prices to consumers.

73.     Through the conduct described herein, defendants willfully maintained that monopoly power by anticompetitive and exclusionary conduct. They acted with the intent to maintain this power, and the illegal conduct has enabled them to do so, in violation of Section 2 of the Sherman Act.

74.   The anticompetitive conduct includes, but is not limited to:

a.   **Predatory pricing**. The ready mix cartel obtained, maintained, and protected their joint monopoly by pricing below variable cost, while sometimes recouping those losses through Argos cement rebates. The ready mix cartel understood any losses from predatory pricing would be recouped by the supracompetitive prices they would charge after their targets were driven from the market.

b.   **Bid rigging**. The ready mix cartel obtained, maintained, and protected their joint monopoly by arranging bids and taking turns at undercutting low price competitors in order to spread the losses among the participating firms and thus vanquish the competition in a war of attrition.

c.   **Supracompetitive pricing**. Whenever possible, the ready mix cartel raised prices to recoup their losses and to reap the rewards of their domination of the market.

d.   **Reduction in quality**. Argos was also able to undercut competitors and recoup losses by selling cheaper, lower quality concrete products (without disclosure to customers)

called "868" and "G-crete," which cost approximately $5 less per yard to make.

e. **Monopoly leveraging**. The ready mix cartel was successful in this scheme by leveraging Argos' upstream monopoly in the market for portland cement.

75.   The market for ready mix concrete in coastal Georgia and southeastern coastal South Carolina has been harmed by defendants' conduct, as consumers of ready mix concrete have been forced to pay supracompetitive prices while receiving lower quality ready mix concrete. That is, defendants excluded competition including Southeast Ready Mix through anticompetitive acts and could thus charge supracompetitive prices and offer a lower-quality product. For example:

a. Consumers were overcharged as much as 20%.

b. Consumers were sold inferior products such as "868" concrete and "G-crete," which led to construction defects for hundreds of homes.

c. Consumers were left with fewer choices in the market.

76.   Southeast Ready Mix provides superior ready mix concrete at lower prices.

77.     Southeast Ready Mix has been harmed by defendants' willful maintenance of their joint monopoly and their exclusion of lower priced competitors.

## COUNT II – READY MIX DEFENDANTS

## Attempted Monopolization of the Ready Mix Concrete Market
## 15 U.S.C. § 2

78.     Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

79.     Defendants willfully engaged in a course of conduct, including anticompetitive and exclusionary actions, with the specific intent of monopolizing the market for ready mix concrete in Statesboro, Savannah, and Bluffton/Hilton Head, and there is a dangerous probability that, unless restrained, anticompetitive conditions will occur in violation of Section 2 of the Sherman Act.

80.     Defendants took overt acts manifesting that intent, such as that described in Paragraph 74 above.

81.     The market has been harmed by defendants' conduct, as consumers of ready mix concrete have been forced to pay supracompetitive prices while receiving lower quality ready mix concrete.

82.    Southeast Ready Mix provides superior concrete at competitive prices.

83.    Southeast Ready Mix has been harmed by defendants' willful attempts to monopolize the market for ready mix concrete and their exclusion of all price competitors.

## COUNT III – READY MIX DEFENDANTS

### Conspiracy to Monopolize the Ready Mix Concrete Market
### 15 U.S.C. § 2

84.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

85.    Defendants combined and conspired to acquire and maintain monopoly power in the markets for ready mix concrete in Statesboro, Savannah, and Bluffton/Hilton Head, with the specific intent and purpose to exclude all other competition and to monopolize that market.

86.    Defendants took overt acts manifesting this intent, such as that described in Paragraph 74 above.

87.    Defendants' concerted action had the necessary and direct effect of entrenching their monopoly power.

88.    The market has been harmed by defendants' conduct as consumers of ready mix concrete have been forced to pay supracompetitive prices while receiving lower quality ready mix concrete.

89.    Southeast Ready Mix provides superior ready mix concrete at competitive prices.

90.    Southeast Ready Mix has been harmed by defendants' willful maintenance of their monopoly and their exclusion of low price competitors.

## COUNT IV – READY MIX DEFENDANTS

### Conspiracy to Restrain Trade (Group Boycott)
### in the Ready Mix Concrete Market
### 15 U.S.C. § 1

91.    Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

92.    Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

93.   Argos, a horizontal competitor and vertical supplier of Southeast Ready Mix, and Evans, Elite, Coastal, and Thomas (all competitors of both Argos and Southeast Ready Mix) combined and conspired to restrain trade in violation of Sherman Act Section 1 by engaging in a scheme to exclude low price leaders from the market for ready mix concrete in the markets for Statesboro, Savannah, and Bluffton/Hilton Head in order to succeed in their price-fixing scheme.

94.   Defendants' agreement and actions in furtherance of the conspiracy foreclosed the market for ready mix concrete in relevant markets.

95.   The market has been harmed by defendants' conduct, as consumers of ready mix concrete in the relevant markets have been forced to pay supracompetitive prices while receiving lower quality ready mix concrete.

96.   Southeast Ready Mix provides superior ready mix concrete at competitive prices.

97.   Southeast Ready Mix has been harmed by the conspiracy.

## COUNT V – ARGOS

## Monopolization of the Cement Market
## 15 U.S.C. § 2

98.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though full set forth at length herein.

99.   Defendant Argos possesses market power in the market for portland cement in coastal Georgia and southeastern coastal South Carolina. It has the power to exclude competition and raise prices and have exercised that power unlawfully.

100.  Through the conduct described herein, Argos willfully maintained that monopoly power by anticompetitive and exclusionary conduct, including by leveraging its monopoly power in the cement market to impose anticompetitive conditions in the market for ready mix concrete and in support of their conspiracy to fix prices in that market, including:

    a.    Overcharges by as much as 50%;

    b.    Competitive disadvantages (and ultimately lost business/profits) from rebates and credits given to concrete cartel members; and

c.   Competitive disadvantages (and ultimately lost business/profits) from competitively sensitive information provided to concrete cartel members.

101.  The market has been harmed by Argos' conduct as consumers of cement, including Southeast Ready Mix, have been forced to pay supracompetitive prices for cement.

102.  Southeast Ready Mix has been disadvantaged as a competitor in the market for ready mix concrete through the leveraging described herein.

103.  Southeast Ready Mix has been harmed by Argos' willful maintenance of their monopoly in the market for portland cement.

## COUNT VI – ARGOS

### Attempted Monopolization of the Cement Market
### 15 U.S.C. § 2

104.  Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

105.  Defendant Argos willfully engaged in a course of conduct, including anticompetitive and exclusionary actions, with the specific intent of monopolizing the market for portland cement in coastal Georgia and southeastern coastal South Carolina, and there is a dangerous probability that,

unless restrained, anticompetitive conditions will occur in violation of Section 2 of the Sherman Act.

106.   Argos took overt acts manifesting that intent, such as that described in Paragraph 50 above.

107.   The market has been harmed by Argos' conduct, as consumers of portland cement have been forced to pay supracompetitive prices.

108.   Southeast Ready Mix has been harmed by Argos' willful attempts to monopolize the market for portland cement and their exclusion of all price competitors.

## COUNT VII – CEMENT DEFENDANTS

### Conspiracy to Restrain Trade (Price Fixing) in the Cement Market 15 U.S.C. § 1

109.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

110.   Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable, *per se* illegal restraint of trade in violation of Section 1 of the Sherman Act.

111.   Beginning as early as 2001 and continuing without interruption through the present, the exact starting date being unknown to Southeast

Ready Mix and exclusively within the knowledge of defendants, the cement cartel defendants entered into a continuing contract, combination, or conspiracy to unreasonably restrain trade by artificially reducing or eliminating competition in coastal Georgia and southeastern coastal South Carolina.

112.   In particular, the cement cartel combined and conspired to raise, fix, maintain, or stabilize the price of cement. As a result of its conduct, prices were actually raised, fixed, maintained, and stabilized in coastal Georgia and southeastern coastal South Carolina.

113.   The conspiracy among the cement cartel participants consisted of a continuing agreement, understanding, and concerted action among them.

114.   As a result of the unlawful conduct, Southeast Ready Mix has been injured in its business and property in that it has paid more for cement than it otherwise would have paid in the absence of the unlawful cement cartel.

## COUNT VIII – ALL DEFENDANTS

### Declaratory Judgment
### 28 U.S.C. § 2201

115.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

116.   An actual and justiciable controversy exists between Southeast Ready Mix and Defendants concerning Defendants' violations of federal and state antitrust law.

117.   Defendants' actions and assertions described above have caused and will continue to cause irreparable harm to Southeast Ready Mix and the public. Southeast Ready Mix has no adequate remedy at law.

118.   Southeast Ready Mix therefore seeks a declaration from this Court declaring that the cement cartel defendants have attempted and maintained an illegal monopoly under Section 2 of the Sherman Act in the market for portland cement and a conspiracy to restrain trade under Section 1 of the Sherman Act in the market for portland cement, to the detriment of consumers and competition.

119.   Southeast Ready Mix also seeks a declaration from this Court declaring that the ready mix cartel defendants have attempted and maintained an illegal joint monopoly under Section 2 of the Sherman Act in the market for ready mix concrete, and a conspiracy to restrain trade under Section 1 of the Sherman Act, to the detriment of consumers and competition.

## COUNT IX – ALL DEFENDANTS

### Restraint of Trade
### O.C.G.A. § 13-8-2

120.   Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

121.   The ready mix cartel defendants—horizontal competitors of Southeast Ready Mix—combined and conspired to restrain trade in violation of Georgia law by engaging in a scheme to exclude low price leaders from the market for ready mix concrete in coastal Georgia and southeastern coastal South Carolina to succeed in their price-fixing scheme.

122.   Argos, Cemex, Holcim combined and conspired to restrain trade in violation of Georgia law by agreeing to monopolize and to fix prices in the market for portland cement in coastal Georgia and southeastern coastal South Carolina.

123.   Defendants' agreement and actions in furtherance of the conspiracy foreclosed the markets for ready mix concrete and portland cement in coastal Georgia and southeastern coastal South Carolina.

124. The market has been harmed by defendants' conduct, as consumers of ready mix concrete in southeast Georgia have been forced to pay supracompetitive prices while receiving lower quality ready mix concrete.

## COUNT X – READY MIX DEFENDANTS

### Tortious Interference with Business Relations
### Georgia Common Law

125. Plaintiffs repeat each and every allegation contained in the paragraphs above and incorporate by reference each preceding paragraph as though full set forth at length herein.

126. Defendants acted improperly and without privilege to interfere with the business relationships of Southeast Ready Mix, including relationships with suppliers and customers. Defendants, for example, refused to do business with certain companies that had a relationship with Southeast Ready Mix.

127. Defendants' interference was purposeful and with malice and the specific intent to injure Southeast Ready Mix.

128. Defendants' conduct induced customers and suppliers to not enter into or continue a business relationship with Southeast Ready Mix. Absent the interference, those business relationships were reasonably likely to continue or to develop.

129. Defendants' conduct proximately caused financial injury to Southeast Ready Mix.

## REQUEST FOR RELIEF

WHEREFORE, Southeast Ready Mix requests that this Court:

A.     Enter a temporary restraining order against defendants to enjoin them from continuing their illegal acts;

B.     Declare that defendants' conduct violates 15 U.S.C. §§ 1–2 and Georgia state law;

C.     Enter judgment against defendants;

D.     Award Southeast Ready Mix treble damages;

E.     Award Southeast Ready Mix pre- and post-judgment interest at the applicable rates on all amounts awarded;

F.     Award Southeast Ready Mix its costs and expenses of this action, including its reasonable attorneys' fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. §§ 15 and 26;

G.     Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this complaint; and

H.     Order any other such relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs Southeast Ready Mix and Mayson Concrete, Inc. hereby demand a trial by jury on all claims.

DATED: July 24, 2017

/s/ Richard L. Robbins
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
ROBBINS ROSS ALLOY
  BELINFANTE LITTLEFIELD
  LLC
999 Peachtree St. NE, Suite 1120
Atlanta, GA 31401
Telephone: (678) 701-9381
Facsimile: (404) 856-3250

Jarod Bona
California Bar No. 234327
Aaron R. Gott
California Bar No. 314264
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
Telephone: (858) 964-4589
Facsimile: (858) 964-2301
jarod.bona@bonalawpc.com
aaron.gott@bonalawpc.com

*Attorneys for Plaintiffs*
*Southeast Ready Mix, LLP and*
*Mayson Concrete, Inc.*