# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF GEORGIA

# ATLANTA DIVISION

| | |
|---|---|
| Southeast Ready Mix, LLC et al., | Civil Action No.:17-cv-02792-ELR |
| *Plaintiffs*, | |
| Argos North America Corp. et al., | |
| *Defendants*. | |

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

# Table of Contents

I.   THE LEGAL STANDARD ON MOTIONS TO DISMISS ........................... 2

   A.  General Pleading Standards ..................................................................... 2

   B.  The Standard for Pleading Conspiracy Claims ....................................... 3

II.  THE READY-MIX CONSPIRACY ................................................................. 6

   A.  The Allegations of the Complaint ............................................................ 6

   B.  Defendants' Responses ........................................................................... 14

III. THE CEMENT CONSPIRACY ..................................................................... 21

   A.  The Allegations of the Complaint .......................................................... 21

   B.  Defendants' Responses ........................................................................... 23

IV.  SIMPLIFICATION OF ISSUES ON THIS MOTION ............................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A. Richfield Co. v. USA Petroleum Co.,*
   495 U.S. 328 (1990) ................................................................................ 22

*al-Kidd v. Ashcroft,*
   580 F.3d 949 (9th Cir. 2009) ................................................................... 9

*Anderson News, L.L.C. v. Am. Media, Inc.,*
   680 F.3d 162 (2d Cir. 2012) ........................................................ 8, 19, 31

*Anderson v. United States,*
   417 U.S. 211 ............................................................................................ 21

*Arar v. Ashcroft,*
   585 F.3d 559 (2nd Cir. 2009) .................................................................. 9

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .................................................................. 8, 9, 18, 33

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .............................................................. 8, 10, 27, 30

*Bolinger v. First Multiple Listing Service, Inc.,*
   838 F. Supp. 2d 1340 (N.D. Ga. 2012) ...................................... 23, 27, 29

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ................................................................................ 24

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) ................................................................................ 24

*In re Chocolate Confectionary Antitrust Litig.,*
   801 F.3d 383 (3d Cir. 2015) ................................................................... 11

*Douglas v. United States,*
   814 F.3d 1268 (11th Cir. 2016) .............................................................. 18

*Esco Corp. v. United States*,
    340 F.2d 1000 (9th Cir. 1965) ................................................................. 10

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
    720 F.3d 33 (1st Cir. 2013) ............................................................... 10, 12

*In re Flat Glass Antitrust Litigation*,
    385 F.3d 350 (3d Cir. 2004) ............................................................. 11, 19

*Foman v. Davis*,
    371 U.S. 178 (1962) .............................................................................. 34

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d Cir. 2016) ................................................................. 20

*Harrigan v. Metro Dade Police Dep't Station No. 4*,
    636 F. App'x 470 (11th Cir. 2015) ......................................................... 9

*Hernandez-Cuevas v. Taylor*,
    723 F.3d 91 (1st Cir. 2013) ............................................................... 9, 27

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) .............................................................. 8

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) .............................................................. 10

*Kirtsaeng v. John Wiley & Sons*,
    568 U.S. 519 (2013) .............................................................................. 26

*Klor's v. Broadway–Hale Stores, Inc.*,
    359 U.S. 207 (1959) .......................................................................... 15, 24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .............................................................................. 21

*Palmer v. BRG of Ga.*,
    498 U.S. 46 (1990) ................................................................................ 26

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
    870 F.3d 1262 (11th Cir. 2017) ........................................................................*passim*

*Smith v. Israel*,
    619 F. App'x 839 (11th Cir. 2015) ................................................................ 9

*Tellabs, Inc. V. Makor Issue & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................................ 9

*In re Baby Food Antitrust Litigation*,
    166 F.3d 112, 118 (3d Cir. 1999) .............................................................. 10

*In re Ins. Brokerage Antitrust Litigation*,
    618 F.3d 300, 324, n.23 (3d Cir. 2010) ..................................................... 11

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ............................................... 9, 18, 19, 29

*Theatre Enters. v. Paramount*,
    346 U.S. 537 (1954) ..................................................................................... 30

*United States v. Russo*,
    302 F.3d 37 (2d Cir. 2002) ........................................................................ 21

*United Techs. Corp. v. Mazer*,
    556 F.3d 1260 (11th Cir. 2009) ................................................................ 30

*In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*,
    868 F.3d 132 (3d Cir. 2017) ..................................................................... 10

*Williams v. Richland Cty. Children Servs.*,
    489 F. App'x 848 (6th Cir. 2012) ............................................................. 9

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) ................................................................ 11

**Statutes**

15 U.S.C. § 1 ................................................................................ 21, 22, 26

**Rules**

Fed. R. Civ. P.  8 ...................................................................................... 8

Fed. R. Civ. P. 8(a)(2) .............................................................................. 8

Fed. R. Civ. P. 8(d)(3) ............................................................................ 30

Fed. R. Civ. P. 15(a)(2) ........................................................................... 34

Myron Watkins, "Electrical Equipment Antitrust Cases," ...................... 25

Fed. R. Civ. P. 12(b)(6) ........................................................................... 31

University of Chicago Law Review, 29:97 (1961) ...................................... 25

**Other Authorities**

Myron Watkins, "Electrical Equipment Antitrust Cases," University
    of Chicago Law Review, 29:97 (1961) .................................................. 25

The core of the complaint involves two conspiracies: a conspiracy of cement manufacturers at a supply level (cement is the main component of concrete); and a conspiracy of ready-mix concrete manufacturers at the distribution level.

Defendants deny any conspiracy. They label their actions as nothing more than "independent and competitive behavior" (DE 53-1 at 1), taken on a purely "unilateral" basis (DE 53-1 at 11). They also label the complaint as merely "conclusory" *Id*.

Contrary to defendants' claims, this complaint is ***not*** conclusory and does ***not*** describe unilateral action or independent conduct. Companies operating "independently" and "unilaterally" do not exchange prices with competitors, agree to target competitors, agree on prices, agree on surcharges, agree not to deal with other competitors, or hop into other people's trucks and tell them they need to go along with price increases that other competitors have already agreed to. But the complaint alleges exactly that, with specific facts, dates, people, companies, conversations, and actions involving the defendants, in some of which they admit fixing prices and agreeing to boycott.

It is certainly true that plaintiffs may not have alleged the full details of the conspiracy. But they do not have to because "conspiracies are rarely evidenced by explicit agreements, but nearly always must be proven through

inferences that may fairly be drawn from the behavior of the alleged conspirators." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (internal quotations omitted).

In this case, the complaint alleges direct evidence of illegal agreements. It also alleges circumstantial evidence that would satisfy the requirement of "plus factors" in the absence of such direct evidence. Those allegations, even at this preliminary stage, exclude any plausible unilateral conduct and make out a credible and sustainable claim of conspiracy. That is far beyond what is required to satisfy Rule 8(a)(2).

## I.   THE LEGAL STANDARD ON MOTIONS TO DISMISS

### A.   General Pleading Standards

A complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he pleading standard Rule 8 announces does not require detailed factual allegations."). The complaint must "plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332 (11th Cir. 2010). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. But the "plausibility standard is not

2

akin to a 'probability requirement.' " *Iqbal*, 556 U.S. at 678. Plaintiffs do **not** need to establish their claims by a "preponderance of the evidence" before discovery or even include all facts necessary to carry their burden—plausibility is enough. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010); *al-Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir. 2009).

On a motion to dismiss the complaint must be "liberally" construed, *Harrigan v. Metro Dade Police Dep't Station No. 4*, 636 F. App'x 470, 473 (11th Cir. 2015); *Smith v. Israel*, 619 F. App'x 839, 842 (11th Cir. 2015), and courts should draw all inferences in favor of the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. at 679. Finally, "[t]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 103 (1st Cir. 2013); *see also Tellabs, Inc. V. Makor Issue & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Williams v. Richland Cty. Children Servs.*, 489 F. App'x 848, 853 (6th Cir. 2012); *Arar v. Ashcroft*, 585 F.3d 559, 619 (2nd Cir. 2009).

## B.    The Standard for Pleading Conspiracy Claims

The facts required to plead an antitrust conspiracy claim depend on whether the plaintiff pleads an actual agreement or seeks to infer one from parallel conduct. Where actual agreements are pled the plaintiff meets its burden. But a complaint "based on an inferred agreement must show more

than parallel conduct." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 870 F.3d 1262, 1271 (11th Cir. 2017); *see also* a *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (Only where obvious lawful alternative reasons for the conduct exist must the plaintiff "plead evidentiary facts" that tend to exclude "parallel conduct."). An actual agreement can be established by as little as a "knowing wink." *Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965). There is seldom direct evidence of a conspiratorial agreement at the start of a case. Or, even if it exists, it is "largely in the hands of the alleged conspirators." *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 170 (3d Cir. 2017).[1]

In *In re Baby Food Antitrust Litigation*, the Third Circuit said that direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." 166 F.3d 112, 118 (3d Cir. 1999) (Internal quotations omitted). And in *In re Ins. Brokerage Antitrust Litigation*,

---

1.     *Wellbutrin* was a summary judgment case. The First Circuit has noted that "considerable confusion" in the lower courts has resulted from *Twombly*, often leading them to apply the summary judgment standard instead of the much lower motion to dismiss standard. *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 43 (1st Cir. 2013). Indeed, "allegations contextualizing agreement need not make any unlawful agreement more likely than independent action nor need they rule out the possibility of independent action at the motion to dismiss stage. Requiring such heightened pleading requirements at the earliest stages of litigation would frustrate the purpose of antitrust legislation and the policies informing it. *Id.* at 47.

that court included as direct evidence, "a document or conversation explicitly manifesting the existence of the agreement in question." 618 F.3d 300, 324, n.23 (3d Cir. 2010). Here, the complaint recites internal discussions and conversations among the defendants that form this direct evidence.

Even if direct evidence didn't exist in this case, courts consider so-called "plus factors" to decide whether the conspiracy allegations are met. "Plus factors are proxies for direct evidence because they tend to ensure that courts punish concerted action—an actual agreement." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 398–99 (3d Cir. 2015). In the Eleventh Circuit, "any showing by [a plaintiff] that tends to exclude the possibility of independent action can qualify as a plus factor." *Quality Auto*, 870 F.3d at 1272 (citing *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1291 (11th Cir. 2003)). In *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 360 (3d Cir. 2004) (internal quotation omitted), the Third Circuit identified

> at least three such plus factors: (1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a traditional conspiracy.

This complaint alleges all three. In fact, the Eleventh Circuit does not prescribe any required number of plus factors or weight. Instead, a court must "decide a factor's importance only after reviewing it in the context of the facts of the case

and determining its tendency "to exclude the possibility of independent action." *Quality Auto*, 870 F.3d at 1272. Its approach is more in line with the First Circuit in being "wary of placing too much significance on the presence or absence of 'plus factors' at the pleadings stage." *Evergreen*, 720 F.3d at 47.

We now turn to an analysis of the conspiracy claims themselves.

## II.    THE READY-MIX CONSPIRACY

### A.    The Allegations of the Complaint

Argos, Coastal, Elite, Evans, and Thomas are ready-mix manufacturers who compete with the plaintiffs (¶¶ 30, 34, 40). It is a highly-concentrated market and these defendants control about 80% of the ready-mix market (¶ 30). Plaintiffs Mayson (now out of business), and Southeast are low-price competitors (¶¶ 35–36).

Plaintiffs allege that, beginning in 2009, the Ready-Mix Defendants conspired to exclude from the market all competitors who refused to join their conspiracy to fix prices (¶¶ 30–33). They did so by sharing competitive information about non-conspirator sales (¶ 32b); targeting the non-conspirators with low or predatory prices, so that no individual competitor would suffer the entire cost (¶ 32c); and engaging in a horizontal allocation of customers to avoid genuine competitive bidding among themselves (¶ 33).

In 2012, Mayson was driven out of business by these anti-competitive

tactics, and on March 6, 2012, the Argos regional manager (Andy Stankwych) told his team that "a change in attitude" was in order (due to the less competitive environment) and instructed his staff to coordinate with competitors to come up with a plan for a price increase (¶ 37). But when Southeast bought Mayson's assets and took on its former owner, an Argos employee complained, "there goes the price increase" (¶ 38).

Plaintiffs do not have all the details of the conspiracy, which are in the defendants' control, so some allegations are necessarily broad descriptions, and some are conclusory. But there is nothing broad or conclusory about the following specific facts. They identify specific defendant meetings, actions, and agreements that, on their face, are direct evidence of anticompetitive agreements. These facts show that:

- Argos agreed with Holcim—horizontal competitors—not to supply cement to specific competitors who were not ready-mix conspirators (¶ 32e);

- sometime in 2010, an Argos executive (Greg Melton) met with an Elite executive (David Melton, his brother)—horizontal competitors—to discuss how to exclude Mayson, a small and low-price competitor (¶¶ 35–36);

- on February 28, 2012, Coastal (through its president Tim

7

Coughlin), Argos (through Greg Melton) and Elite (through co-owner Troy Baird)—horizontal competitors—exchanged future price-increase letters (¶ 36a);

- on March 12, 2012, Argos (through Greg Melton) warned its employees that if they undercut Elite or Coastal—horizontal competitors—they would be fired. But they could safely undercut non-conspirators Premier Concrete and Mayson Concrete (¶ 32b);

- on March 30, 2012, an Argos executive (Greg Melton) told his sales team that Elite president (Troy Baird) had threatened Mayson Concrete, warning Mayson that if it did not join in the Argos initiated price increases, it would suffer (¶ 40a);

- after Mayson was driven out of business and Southeast took over Mayson's assets, Elite's owner (Trey Cook) asked Mark Turner (owner of Southeast) to meet him in a bank parking lot. When Turner arrived, Cook hopped into Turner's truck, told him that Coastal, Argos, and Elite—horizontal competitors—had all agreed on new environmental fees and surcharges, and urged that Southeast Ready Mix should agree too (¶ 39);

- on May 15, 2012, an Argos salesperson (Jim Pedrick), reported to Argos management that all the conspirators had jointly agreed to

8

stop buying sand from a supply company that had business and family relationships with Southeast (¶ 40c); this is a concerted refusal to deal, *Klor's v. Broadway–Hale Stores, Inc.*, 359 U.S. 207, 212 (1959);

- on May 30, 2012, executives of Argos (Greg Melton and Andy Stankwych and Elite (Trey Cook)—horizontal competitors —met at a Cracker Barrel restaurant to discuss their prices. In that discussion, Elite disclosed its own pricing to its competitors, complaining to Argos that it had to drop its price to $86/yard to meet Southeast's competition (¶ 40e);

- on April 3, 2012, in a 5:00pm phone call, executives of Argos (Greg Melton) and Elite (David Melton)—horizontal competitors— discussed a new price fixing scheme, and jointly agreed to add a fuel surcharge to all ready mix deliveries (¶ 40b);

- on March 23, 2016, Argos (through Mike Taylor) told Argos salesmen not to compete with Evans or Thomas—horizontal competitors—but instead that they should price Argos' bids on jobs near Evans or Thomas plants at "sky high" prices (¶ 36c);

- on June 19, 2012, Greg Melton of Argos told Argos management team that it had decided to allocate specific certain customers to

9

its horizontal competitor, Evans. These customers were derived from Southeast and Premier Concrete customer lists that had been obtained by Argos employees (¶ 40f);

- on October 16, 2012, Coastal and Argos —horizontal competitors— exchanged strategies for competing with Southeast (¶ 40g);

- on October 25, 2012, Coastal and Argos—horizontal competitors— discussed a joint price increase of $7/yard, to be effective January 1, 2013;

- on October 9, 2012, Argos (through Jim Pedrick) and Elite (through David Melton)—horizontal competitors—agreed to a price increase;

- on October 11, 2012, Pedrick told Argos management that he had *already* fixed new prices with Elite—a horizontal competitor— and that Evans—another horizontal competitor—would agree to them too (¶ 40l);

- on October 17, 2012, Pedrick confirmed to Argos management that Evans (through Bo Strickland) *had* agreed to an $8/yard price increase (¶ 40m);

- on October 18, 2012, Pedrick confirmed that Argos and Coastal price increase letters had been sent out (¶ 40n);

- on March 3, 2016, Argos (the vertically-integrated company) offered its own ready-mix subsidiary *and Evans*—a horizontal competitor —$15/yard rebates if the ready-mix companies stuck to their customer allocation scheme and did not bid against each other (¶ 42);

- on March 7, 2016, the defendant conspirators discussed these rebates and how they could be used as part of a scheme of predatory pricing to destroy low-price competitors (¶ 44b); and

- on May 12, 2016, Argos (through Greg Melton) and the other horizontal defendants discussed the success of the green zone rebate strategy, "bragging about jobs that were won as a result of cement credits received from Argos USA, and further discusses additional areas in which the selective rebate/predatory price-cutting strategy can provide competitive advantages" (¶ 44e).

Those actions, which involve joint action to target and punish price cutters, took place in 2012. In April 2016, there was a new development when Elite left the conspiracy. Previously, Argos managed warned its employees that they could match Elite's prices, but that employees would be fired if they undercut Elite (¶ 32b). But in April 2016, after Elite abandoned the conspiracy, Argos then told its salespeople to target both Southeast ***and*** Elite with price

11

cuts (¶ 36d).

These joint actions all impeach defendants' claims that their behavior is "unilateral" or "parallel." To the contrary, these factual allegations, which must be taken as true, *Douglas v. United States*, 814 F.3d 1268, 1274 (11th Cir. 2016), are direct evidence of both intercompetitor exchanges of sensitive competitive information and of agreements that demonstrate far "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. In *Text Messaging*, 630 F.3d at 628, Judge Posner referred to the "smoking gun," or

> direct evidence, which would usually take the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy . . . .

In fact, this complaint alleges contains several of exactly these types of admissions (¶¶ 39–40a–c) in the form of conversations among the defendant co-conspirators. These allegations are obviously based on insider information.

Defendants claim that any allegations of mere discussions and meetings are irrelevant (DE 53-1 at 17), but that is incorrect. In *Text Messaging*, 630 F.3d at 628, the court emphasized that the allegation that competitors met and exchanged prices was "of note" and a factor supporting the allegations of conspiracy. The difference is that, in *Text Messaging*, the competitor meetings

were at trade associations where, one assumes, there were antitrust guidelines and precautions. Here, by contrast, the defendants communicated or met on an informal basis to discuss forbidden subjects. Allegations of meetings and discussions—coupled with allegations of specific agreements and actions taken in furtherance of those agreements—are more than sufficient to allege a conspiracy. This case is also similar to *Anderson News*, where the Second Circuit reversed a dismissal, emphasizing that the complaint

> alleges not just that all of the defendants ceased, in virtual lock-step, to deal with Anderson, but alleges that on various dates within the preceding two-week period defendants and News Group—through their executives, 10 of whose names or positions are specified—***had met or communicated with their competitors and others and made statements that may plausibly be interpreted as evincing their agreement to attempt to eliminate Anderson and Source as wholesalers in the single-copy magazine market*** . . . .

680 F.3d. at 187 (emphasis added). Furthermore, aside from the direct evidence of conspiratorial meetings and agreements, the fact that price exchanges occurred at "a higher level of the . . . producers' structural hierarchy" (meaning higher level employees) is additional support for an inference of conspiracy. *Flat Glass*, 385 F.3d at 369.

Aside from the direct evidence, other plus factors include the fact that Argos granted discriminatory and predatory pricing rebates not only to its own subsidiary (which it is certainly entitled to do) but also to the defendant

competitors as well (¶¶ 42, 44b, 44e). Acts against economic self-interest are circumstantial evidence of conspiracy. *Quality Auto,* 870 F.3d at 1281; *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 781 (2d Cir. 2016). What legitimate incentive would Argos have to act ***against*** its own economic self-interest and ***to help*** selected horizontal competitors, by granting them rebates—but only to the ones who agreed to price fixing (¶¶ 40b, f–i, k–m, 42, 44b, e)? What legitimate incentive would Argos have to act ***against*** its own economic self-interest and ***to help*** selected horizontal competitors by submitting excessively high bids on jobs in its competitors' green zones and losing that business (¶ 43)? And what legitimate incentive would the other defendants have to engage in collusive bids and customer allocations (¶¶ 41–44), but only when they were rewarded by cement credits that allowed for predatory pricing against companies (like plaintiffs) that refused to participate in price fixing (¶¶ 44b, e)?

## B.   Defendants' Responses

First, defendants argue (DE 53-1 at 10–12), that the complaint alleges only unilateral actions by Argos, and therefore fails to allege a conspiracy. This is mistaken. The complaint alleges facts from which it can be inferred that all five defendants (Coastal, Argos, Elite, Evans, Thomas) met, exchanged information, agreed on price, and agreed to target the plaintiffs (¶¶ 40b, f–i,

14

k–m).

It is correct that some actions (like Argos' discriminatory rebates to co-conspirators, or Argos' instructions to its own employees to target price cutters), might under different circumstances have been purely internal, unilateral actions immune from Section 1. But "when two people enter into a joint venture of conspiratorial nature, the actions and utterances of either done in furtherance of that conspiracy are deemed authorized by the other." *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002); *see also Anderson v. United States*, 417 U.S. 211, 218 n.6 (1974 ("Conspirators are partners in crime. Each is deemed to have authorized the acts and declarations of the other undertaken to carry out their joint venture."). Given the factual allegations about explicit illegal agreements described above, it is more than "plausible" that Argos' actions were taken in ***furtherance*** of an existing conspiracy, and were therefore ***not*** unilateral actions.

Next, defendants argue (DE 53-1 at 12–14) that plaintiffs lack standing to complain about defendants' price-fixing, because, as members of the market, the plaintiffs would have benefited from increased prices, citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986). This argument is perplexing, because Count IV is expressly labeled "Group Boycott," not price fixing. Plaintiffs allege that, as a result of their own refusal to support a price-

15

fixing scheme, the defendants conspired to drive them out of business to eliminate price competition. Defendants cite no authority that plaintiffs lack standing for that claim. Section 1 of the Sherman Act "is intended to forbid price-fixing conspiracies that are designed to drive competitors out of the market." *A. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 350 (1990).

Defendants then argue (DE 53-1 at 14–16) that plaintiffs' claim that defendants engaged in a "rotating" price-fixing scheme is not plausible because it alleges only Argos' unilateral actions and does not specify any actions of competitors. This is a very charitable mischaracterization of what the complaint actually says.

In fact, the complaint specifically alleges that, by 2010, Argos and Elite executives had already discussed destroying Mayson as the low-price leader (¶ 35); that different defendants followed Mayson on its routes, identified its customers, underbid it to finally destroy it, and also attempted to raise its input prices (¶ 36); that Argos instructed its employees never to undercut co-conspirators Elite, Coastal, Evans, and Thomas, but instead to "aggressively target" Mayson, and eventually Southeast (¶ 36b–c); that an Argos executive related how Elite's executive had warned Mayson to "play along" with Argos' price increases, or that Mayson would suffer if it undercut Elite's prices (¶ 40a); that Mayson went out of business in 2012 (¶ 37); that in mid-April 2012, ***Elite's***

16

***president told Southeast's owner that Coastal, Argos, and Elite had all
agreed to add "fuel" and "environmental" surcharges*** and that Southeast
should too (¶ 40); that when he refused, members of the group followed his
trucks to identify Southeast's customers, just as they had done to Mayson
(¶ 40d–e); that Argos and Elite executives met to discuss prices on May 30,
2012 (¶ 40e); that Argos allocated Southeast's customers to its competitor,
Elite (¶ 40f); and that on October 25, 2012, Argos and Coastal—direct
competitors—agreed to a price increase of $7/yard (¶ 40h).

These discussions and agreements, which identify specific dates and
parties in the complaint, are not generalized or conclusory. They are also not
unilateral acts but rather a series of ongoing systematic contacts among direct
competitors with one consistent purpose: to jointly target and destroy specific
companies that did not join in the price-fixing conspiracy. Furthermore, while
Argos might in theory have made some decisions unilaterally, it did ***not*** do so
here, because the evidence of the joint action comes from what are obviously
overheard admissions of the defendants themselves. Defendants cite *Bolinger
v. First Multiple Listing Service, Inc.*, 838 F. Supp. 2d 1340, 1360 (N.D. Ga.
2012), for the argument that "[a]bsent any allegation connecting" defendants,
a court cannot infer a conspiracy. But here, the opposite is true. The complaint
describes an ongoing series of discussions and agreements that do "connect"

the defendants.

Defendants argue (DE 53-1 at 16–17) that the complaint does not allege a conspiracy to deprive plaintiffs of essential goods. In fact, the complaint alleges a broad agreement to raise rivals' costs and harm competition by doing so.

The complaint does allege an agreement between Argos and Holcim not to supply cement to Baca Concrete or Bulloch Concrete, two low-price competitors (¶ 32e). This is not a conclusory allegation but a clear statement of an agreement between two specific direct competitors to target two specific other competitors, the motive for which is their low and aggressive pricing. Again, a concerted refusal to deal is a *per se* violation. *Klor's*, 359 U.S. 207. It is certainly true that the targets of this specific conspiratorial agreement were ***not*** the plaintiffs. But there are other and sufficient allegations that do allege joint actions against the plaintiffs. Furthermore, the fact that the defendants targeted a wider range of victims than just the plaintiffs is evidence that the defendants engaged in a broad and joint attack on low price competitors and on competition itself, which is precisely the focus of the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Finally, defendants claim (DE 53-1 at 17–19) that "Plaintiffs fail to allege

any facts supporting actual coordination or agreement among the Ready-Mix Defendants" on market allocation. This refers to the "Green Zone" activity, the customer allocation scheme that protected conspiratorial members from competing bids in their own zones (¶¶ 41–44).

The complaint alleges that starting in 2016, the defendants agreed to a customer allocation scheme (¶¶ 41–42); that they allocated themselves physical exclusive "win" zones (generally, the area close to their plants) (¶ 42); and that Argos gave itself and Evans (and possibly other conspirators as well) an automatic $15/yard discount that would let it underbid price discounters like Southeast (¶¶ 41–42). The complaint also alleges that Argos employee Pedrick threatened that if any ready mix company violated this allocation and built in another company's "green zone," it would be punished (¶ 43). This scheme may lack the poetry of the "phases of the moon" customer allocation conspiracy in the *Electrical Equipment* cases of the 1950s,[2] but it is just as

---

2.   *See* Myron Watkins, "Electrical Equipment Antitrust Cases," in University of Chicago Law Review, 29:97 (1961), p. 101, n.8: "one of the conspiratorial groups determined which confederate would be privileged to make the low bid by what was facetiously called 'phase of the moon' distribution, a scheme providing for cyclical rotation of the privilege, so designed as to insure each member his agreed-upon share of the business . . . ."

According to former Attorney General Edward Levi, the *Electrical Equipment* conspiratorial meetings were arranged under the code name, "choir practice." *Restoring Justice: The Speeches of Attorney General Edward H. Levi* (Chicago,

illegal. *Kirtsaeng v. John Wiley & Sons*, 568 U.S. 519, 553, (2013) ("[A]greements between competitors to allocate territories to minimize competition are illegal." (citing *Palmer v. BRG of Ga.*, 498 U.S. 46, 49–50 (1990)).

Again, we do not question that Argos could, under different circumstances, have unilaterally given its own ready mix company whatever discount it wanted with impunity as far as Section 1 of the Sherman Act is concerned. But that is not what happened. The complaint alleges that, on March 17, 2016, defendants discussed among themselves "selective predatory price-cutting strategy to eliminate nonparticipating competitors" (¶ 44b); that Evans certainly, and possibly other defendants, received discriminatory discounts (¶ 42); and that, on May 12, 2016, Argos executive Greg Melton discussed the success of the green zone strategy with other defendants and discussed other areas to which it could be extended (¶ 44e). This is not unilateral action.

Defendants next argue (DE 53-1 at 17) that mere discussions do "not plausibly establish that the requisite agreement was actually formed." But again, this mischaracterizes the test on a motion to dismiss.

---

University of Chicago Press, 2013), p. 165

"The complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Hernandez-Cuevas*, 723 F.3d at 103. Plaintiffs do not need to allege formal evidence of a separate agreement on every detail of the conspiracy, and defendants cite no case supporting that absurd proposition. Indeed, the defendants seem to be arguing that that if they only ***discussed*** fixing pricing, customer allocations, and group boycotts—all *per se* offenses—this Court should not make any inferences of conspiracy. There are two answers to that. ***First***, the complaint goes further and alleges overt and explicit agreements; ***Second***, even if it didn't, the other alleged facts more than justify "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 556. How can there be independent and innocent action when the defendants met and agreed on joint anticompetitive actions?

## III.    THE CEMENT CONSPIRACY

### A.    The Allegations of the Complaint

Cement is the major component of ready-mix concrete (¶ 49a). The complaint alleges that four cement companies in Georgia—Argos, Evans, Elite, and Coastal (later purchased by Thomas)—conspired to fix the price of cement in three geographic markets: Statesboro, Georgia; Savannah, Georgia; and

Hilton Head/Bluffton, South Carolina (¶ 53). This market is highly concentrated. In Savannah, Argos has a 70% market share and in Statesboro, 100% (¶ 46).

The complaint generally alleges that the defendants "conspired to fix prices in the cement market and to exchange competitively sensitive information about pricing and customers" with the purpose of harming competition (¶ 48). The complaint alleges the following specific facts in support:

- that on October 25, 2012, Argos (through Jim Pedrick) and Giant Cement (through Dan Cleary)—horizontal competitors—discussed a coordinated price increase in the Savannah market effective January 1, 2013 (¶ 48a);

- that on August 27, 2013, Argos (Jim Pedrick) and representatives from Holcim, Giant, and Cemex agree to a January 1 price increase of $8 per ton (¶ 48b);

- that on August 30, 2013, Pedrick stated that Argos' attorneys instructed him to date his price increase for January 15 to reduce the chance of detection (¶ 48b);

- that in 2016, Bill Wagner, president of Argos North America, personally negotiated a price increase of $14/ton with Cemex and Holcim—horizontal competitors (¶ 48c);

- that on March 26, 2016, Argos North America's accountant confirmed with Argos' ready mix management team and Mike Taylor that other cement suppliers—all horizontal competitors— agreed to increase their prices on April 1 (¶ 48d); and

- Finally, the complaint alleges that Holcim and Argos (and earlier, Lafarge)—all horizontal competitors—consistently exchanged market reports that contained sensitive pricing and output information (¶48e).

## B.   Defendants' Responses

Defendants argue the cement price fixing claim is defective for four reasons. ***First***, they argue (DE 53-1 at 24) that "Plaintiffs supply virtually no facts to support their allegation of the existence of an agreement to fix prices." We respectfully disagree. The allegations just recited identify explicit agreements on specific dates, which are virtually the equivalent of the "smoking gun" of which Judge Posner spoke in *Text Messaging*, 630 F.3d at 629. Again, defendants complain that the complaint alleges mere "discussions" and "negotiation" (¶ 48a, c). We do not believe that "discussing" price fixing with a competitor or "negotiating" a three-way price-fixing conspiracy with competitors is exactly exculpatory evidence. But the issue is irrelevant because the very next paragraphs (¶ 48b, d) allege that on August 27, 2013, Holcim,

Giant, and Cemex—all horizontal competitors—agreed to a price increase (¶ 48b), and that March 26, 2016, Argos **confirmed** that the other cement suppliers had **already agreed** to the price increase (¶ 48d).

**Second**, defendants also complain DE 53-1 at 25–26) that these allegations are not detailed enough. But they misconstrue the test here. This is not a summary judgment motion. All plaintiffs need to do is establish "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express . . . .' " *Twombly*, 550 U.S. at 553 (quoting *Theatre Enters. v. Paramount*, 346 U.S. 537, 540 (1954)). The fact-specific allegations of two instances of price fixing are more than sufficient to defeat a motion to dismiss.

**Third**, defendants argue (DE 53-1 at 22–23) that since the complaint charges that Argos monopolizes the market, "it would be irrational" for Argos to bother to fix prices. This argument makes no sense because a "party may state as many separate claims . . . as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3); *see also United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1273-74 (11th Cir. 2009) (complaint not subject to dismissal where it alleges two inconsistent theories of liability, even if both would be simultaneously impossible).

**Fourth**, defendants (DE 53-1 at 26) complain that plaintiffs "fail to

allege that any price increase based on a prior agreement." But Paragraph 57 alleges that "Southeast . . . and other consumers of cement paid supracompetitive prices for cement." So that claim is wrong as well.

***Fifth***, defendants assert that the conspiracy is implausible, arguing that another interpretation is better. But they mistake the test here. As the Second Circuit emphasized in *Anderson News*, 680 F.3d at 185, "[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." Furthermore, there is nothing implausible about a vertically-integrated company conspiring to increase the prices of an essential input (cement) ***and*** of a final product (ready mix concrete), both of which it sells. By conspiring with its competitors in both markets, Argos assures it would not be undercut in price. And by conspiring with Argos, its competitors in both markets would make it easier to get supracompetitive prices, instead of lower prices that were the result of a truly competitive market.

***Finally***, we respectfully ask this Court to take judicial notice of two recent, published decisions in which both Spanish and Colombian antitrust authorities have either recommended prosecution of Cemex, Argos, and Holcim, or found them guilty of, price fixing and customer allocations, precisely the activities alleged in our complaint. *See* Motion Requesting Judicial Notice

of Foreign Government Antitrust Determinations Against Defendants Holcim, Argos and Cemex (filed concurrently with this opposition).

The decision published on the website of La Superintendencia de Industria y Comercio (the Colombia Superintendence of Industry and Commerce) recommends that the Attorney General of Colombia prosecute Cemex, Argos, and Holcim for "colluding to alter the pricing of cement between 2010 and 2013, causing a rise of up to 30% in the value of concrete and, in addition, establishing exclusive areas for sales of their products." These are exactly the types of antitrust violations alleged in the Southeast complaint.

The Spanish Comisión Nacional de los Mercados y la Competencia (The Spanish National Commission on Markets and Competition) also found that cement and concrete companies had fixed prices, allocated customers and exchanged confidential business information. Again, these are the identical tactics alleged in the Southeast complaint. The Spanish authority imposed fines of €5.8 million on Cemex Spain Operations SLU, €4.4 million on Holcim Spain SA, and €1.1 million on Lafarge Cementos SA (in 2011, Argos purchased Lafarge Concrete and in 2014, Lafarge merged with Holcim).

These facts cannot be used as evidence of ultimate liability in this case. But the exact same tactics, by the same defendants, carried on simultaneously in two foreign countries, can and should be considered in determining whether

26

there is "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

## IV.   SIMPLIFICATION OF ISSUES ON THIS MOTION

The complaint alleges both horizontal conspiracies and monopolization claims in both the cement and ready-mix markets. For the reasons more fully explained in plaintiffs' motion for leave to amend the complaint, plaintiffs propose to retain counts 4, 7, and 9 (the two horizontal conspiracies alleged under the Sherman Act and the Georgia antitrust law), and withdraw without prejudice all the remaining counts of the complaint. This will simplify the issues and thus conserve the Court's time and resources in deciding the motions to dismiss.

## CONCLUSION

Defendants argue that their conduct is merely parallel and unilateral. But this is not a case in which we are asking the Court to infer a conspiracy from ambiguous parallel conduct.

Instead, we pled factual allegations of conspiratorial meetings; price discussions among direct competitors; agreements to boycott; joint targeting of smaller competitors by predatory pricing; explicit price-fixing agreements by named individuals on specific dates; and actions taken against economic self-interest. Combined, these are all factors that "tend[] to exclude the possibility

of independent action." *Quality Auto*, 870 F.3d at 1272. That is the only question on this motion.

We respectfully submit that the complaint meets the pleading tests. If it does not, we ask for permission to amend, which should be freely granted. *Foman v. Davis*, 371 U.S. 178, 182 (1962); Fed. R. Civ. P. 15(a)(2). However, we respectfully ask this Court to deny the motion to dismiss in its entirely.

DATED: November 17, 2017

Respectfully submitted,

By: */s/ Richard L. Robbins*
Richard L. Robbins
Georgia Bar No. 608030
rrobbins@robbinsfirm.com
Rachel F. Gage
Georgia Bar No. 547982
rgage@robbinsfirm.com
ROBBINS ROSS ALLOY
BELINFANTE LITTLEFIELD
LLC
999 Peachtree St. NE, Suite 1120
Atlanta, GA 31401
(678) 701-9381
(404) 856-3250 (fax)

By: s/ Jarod Bona
Jarod Bona *(admitted phv)*
jarod.bona@bonalawpc.com
Aaron R. Gott *(admitted phv)*
aaron.gott@bonalawpc.com
BONA LAW PC
4275 Executive Square, Suite 200
La Jolla, CA 92037

(858) 964-4589
(858) 964-2301 (fax)

—

Steven Levitsky (*admitted phv*)
steven.levitsky@bonalawpc.com
BONA LAW PC
The Seagram Building
375 Park Ave., Suite 2607
New York, NY 10152
(212) 634-6861

*Attorneys for Plaintiffs*
*Southeast Ready Mix, LLC and*
*Mayson Concrete, Inc.*

## **L.R. 7.1(D) CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1(D), this is to certify that the foregoing complies with the font and point setting approved by the Court in Local Rule 5.1(B). The foregoing was prepared on a computer, using Century Schoolbook 13-point font.

<u>/s/ Jarod M. Bona</u>
Jarod M. Bona

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of November 2017, the foregoing **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** was filed electronically with the Clerk of the Court using the CM/ECF system which will send a notification of such filing to all counsel of record in this matter.

By: s/ Jarod M. Bona
California Bar No. 234327
(*admitted pro hac vice*)
Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
(858) 964-4589